# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

ROCHELLE MARIE TEBYANI,

      Plaintiff,

v.                                        Case No.  5:20-cv-285-MCR

ACTING COMMISSIONER OF
THE SOCIAL SECURITY
ADMINISTRATION,

      Defendant.

_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision denying her application for a period of disability, and disability insurance benefits ("DIB").  Following an administrative hearing on March 4, 2019, the assigned Administrative Law Judge ("ALJ") issued a decision finding Plaintiff not disabled from January 1, 2017, the alleged disability onset date,[2] through April 29, 2019, the date of the decision.[3]  (Tr. 30-46, 54-91.)

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge.  (Docs. 20 & 21.)

[2] At the hearing, Plaintiff amended her alleged disability onset date to January 1, 2017.  (Tr. 61.)

[3] Plaintiff had to establish disability on or before December 31, 2022, her date last insured, in order to be entitled to a period of disability and DIB.  (Tr. 31.)

Plaintiff is appealing the Commissioner's decision and, as she has exhausted her available administrative remedies, this case is properly before the Court.  Based on a review of the record, the briefs, and the applicable law, the Commissioner's decision is **REVERSED and REMANDED**.

## I.     Standard

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating that the court must

scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.    Discussion

### A.    Issues on Appeal

Plaintiff raises two issues on appeal.  First, she argues that the ALJ's residual functional capacity ("RFC") "determination is not supported by substantial evidence because she failed to properly weigh the opinions of Plaintiff's treating physician O.F. Cannon, Jr., M.D."  (Doc. 25 at 12-19.) Second, she argues that "the ALJ's mental RFC determination is not supported by substantial evidence because she failed to properly weigh the opinion of Plaintiff's treating physician Lawrence Adu, M.D."  (*Id.* at 19-23.) Defendant counters that the ALJ properly considered the opinion evidence and "provided good reasons, supported by substantial evidence, for assigning" little weight to the opinions of Dr. Cannon and Dr. Adu.  (Doc. 26.)  The Court agrees with the Plaintiff on the first issue and, therefore, does not address the remaining issues.

### B.    Standard for Evaluating Opinion Evidence

The ALJ is required to consider all the evidence in the record when making a disability determination.  *See* 20 C.F.R. § 404.1520(a)(3).  With regard to medical opinion evidence, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor."

*Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). Substantial weight must be given to a treating physician's opinion unless there is good cause to do otherwise. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

"'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical evidence supporting the opinion, (4) consistency of the medical opinion with the record as a whole, (5) specialization in the medical issues at issue, and (6) any other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)-(6). "However, the ALJ is not required to explicitly address each of those factors. Rather, the ALJ must provide 'good cause' for rejecting a treating physician's medical opinions." *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 833 (11th Cir. 2011) (per curiam).

Although a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion, *see Wilson v. Heckler*, 734 F.2d

513, 518 (11th Cir. 1984) (per curiam); 20 C.F.R. § 404.1527(c)(2), "[t]he opinions of state agency physicians" can outweigh the contrary opinion of a treating physician if "that opinion has been properly discounted," *Cooper v. Astrue*, 2008 WL 649244, *3 (M.D. Fla. Mar. 10, 2008). Further, "the ALJ may reject any medical opinion if the evidence supports a contrary finding." *Wainwright v. Comm'r of Soc. Sec. Admin.*, 2007 WL 708971, at *2 (11th Cir. Mar. 9, 2007) (per curiam); *see also Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (per curiam) (same).

"The ALJ is required to consider the opinions of non-examining [S]tate agency medical and psychological consultants because they 'are highly qualified physicians and psychologists, who are also experts in Social Security disability evaluation.'" *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) (per curiam); *see also* SSR 96-6p[4] (stating that the ALJ must treat the findings of State agency medical consultants as expert opinion evidence of non-examining sources). While the ALJ is not bound by the findings of non-examining physicians, the ALJ may not ignore these opinions and must explain the weight given to them in his decision. SSR 96-6p.

---

[4] SSR 96-6p has been rescinded and replaced by SSR 17-2p effective March 27, 2017. However, because Plaintiff's application predated March 27, 2017, SSR 96-6p was still in effect on the date of the ALJ's decision.

## C.    Relevant Evidence of Record

### 1.  Treatment Records from O.F. Cannon, Jr., M.D. & Eduardo J. Cruz-Colon, M.D.[5]

Plaintiff presented to Dr. Cannon[6] on January 30, 2017 for evaluation and treatment.  (Tr. 563.)  Dr. Cannon observed that Plaintiff was in severe pain and that she reported having difficulty sleeping, with daily functioning, and performing her duties as an ultrasound technician.  (*Id.*)  Dr. Cannon noted that Plaintiff was "status post a recent fusion at C5-C6 in May of 2016" and that she "recently had an MRI for evaluation of her ongoing pain, and there is an additional disc bulge located below the involved fusion area."[7]

---

[5] Dr. Cruz-Colon is also referred to as Dr. Cruz in the record and briefs.

[6] Dr. Cannon is a Board Certified, Fellowship Trained Orthopaedic Surgeon who specializes in sports medicine, reconstruction, total joints, arthroscopic surgery, fracture care, and worker's compensation.

[7] On May 4, 2016, prior to the amended alleged onset date, Plaintiff underwent an anterior cervical discectomy and fusion ("ACDF") procedure, as follows:
1. Anterior cervical diskectomy with central canal and foraminal decompression [at] C5-[C]6, placement of interbody cage with use of local autograft.
2. C6-[C]7 anterior cervical diskectomy with central canal [and] foraminal decompression, placement of interbody cage with use of local autograft.
3. Anterior plate instrumentation [at] C5-[C]6, C6-[C]7 with segmental fixation.

(Tr. 495.)  Plaintiff's surgeon, Nikola Nenadovich, M.D., released her to return to work as an ultrasound technician in July of 2016.  (Tr. 532.)  In October of 2016, Plaintiff complained of new radicular pain in the right shoulder and arm (Tr. 535) and an MRI on October 19, 2016 revealed, *inter alia*, "increased right foraminal disc protrusion" at C4-C5 (Tr. 546).

(*Id.*)  In terms of her past medical history, it was noted that Plaintiff had "[d]epression, osteopenia, work related injury, [and] verbal and physical abuse in the past."  (*Id.*)  It was also noted that Plaintiff took Xanax for depression and occasionally took Aleve.  (*Id.*)  Although she had chronic pain, she tried to avoid pain medication and expressed a concern about developing a dependency for pain medication.  (*Id.*)  Plaintiff also stated that "medication only dulls the pain a little bit and does not result in any significant improvement."  (*Id.*)

In a Review of Systems, Dr. Cannon observed: "Significant for the findings in the HPI" but "[o]therwise unremarkable."  (*Id.*)  Upon physical examination, Dr. Cannon noted that Plaintiff was a well-developed and well-nourished 56-year-old female and that she answered questions appropriately.  (*Id.*)  Dr. Cannon also noted Plaintiff was in no apparent distress but was in obvious severe pain and looked physically exhausted.  (*Id.*)  He noted Plaintiff had a "well-healed anterior incision to the neck" and that a "[n]eurovascular exam reveal[ed] a radicular component down her right arm with right paracervical pain at approximately C5, C6, and C7 area on the right, and also [at the] levator scapula on the right."  (Tr. 563-64.)  Dr. Cannon "injected these areas with Depo-Medrol" and observed:

> There was some temporary pain relief.  Clinically though, she appears to have cervicalgia due to disc herniation.

> I do not have the MRIs to review. We will try to get her set up with a pain management physician. I have explained to her the risk of any additional surgery. She could run the risk of hav[ing] decreasing range of motion of her neck, which could lead to additional problems. It is significant to note that she did have injections to her neck several months ago with good relief for a temporary period of time.
>
> Plan: Based on her examination, I would recommend no work status. She was going to travel to Phoenix and do a locum-type of job. This patient is not in any condition to travel and/or work. It is my medical opinion that this patient will not be able to return to working as an ultrasound technician due to the neck fusion and ongoing cervicalgia.
> . . .

(Tr. 564.) Dr. Cannon prescribed Percocet for pain but directed Plaintiff to only take this medication for intolerable pain and on a very limited basis. (*Id.*)

Plaintiff returned to Dr. Cannon on April 6, 2017, complaining of continued neck and radicular pain. (Tr. 562.) Dr. Cannon noted: "She continues to have significant neck and radicular pain. She works as an ultrasound technician, and she has been very active and busy in the past. This is affecting her lifestyle. She has had a neck fusion, and continues to have paracervical pain and pain down her arm." (*Id.*) Upon physical examination, Dr. Cannon noted as follows: "Clinically, she has decreased cervical mobility. There is [a] marked spasm noted. Range of motion of her shoulders is good. She does have referred pain down her right arm." (*Id.*) In terms of a treatment plan, Dr. Cannon indicated that Plaintiff had an

appointment scheduled with Dr. Robertson (a neurosurgeon) and opined:

> Currently, she is unable to work.  I completed paperwork for her
> to determine what she can and cannot do.  It is going to be
> extremely difficult for her to be able to concentrate and continue
> working.  She is currently on pain medication.
>
> She is at a high risk for a repeat surgery.  The multiple fusion
> levels in her neck will affect her in the future and cause increased
> risk for progressive degenerative changes above and below the
> fusion mass with risk for continued radiculopathy down her arm.
> At this point, we will see her in the clinic on an as[-]needed basis.

(*Id.*)

> At a follow-up visit on May 25, 2017, Dr. Cannon observed as follows:
>
> She continues to have severe neck pain.  She has been evaluated
> by Dr. Cruz, [sic] is planning epidural steroid injections to the
> neck region.  She continues to have radicular pain down her right
> arm that is quite severe.
>
> In addition, she has trigger points in her neck and back.  These
> have been identified, and one is at the superomedial angle of the
> scapula and was injected with 40 mg of Depo-Medrol.  The right
> paraspinal musculature around C5-C6 was very firm and hard in
> this area and was injected with approximately 40 mg of Depo-
> Medrol.  Both injections were mixed with Xylocaine.  The patient
> did have relief of pain in the office in these trigger point areas.
> She continues to have radicular pain.
>
> According to the patient, if the epidural steroid injections fail, the
> option for her is to live with it or consider further surgical
> intervention.  She is working part-time in a job in Leesburg, and
> after four or five weeks, she is in such pain that she is more than
> likely going to need to discontinue working.  This is dramatically
> affecting her lifestyle, and she is very frustrated and in a great
> deal of pain.
>
> [] I did inject the patient with 20 mg of Depo Medrol in the soft
> tissue of each of the two trigger point areas.  She was provided

with PENNSAID.  We will send a note notifying Dr. Cruz that we
did inject these areas.  Recommendation is for her to follow-up
with him for the epidural steroid injections.

(Tr. 561.)

Upon referral from Dr. Cannon, Plaintiff also presented for an

evaluation with Dr. Cruz-Colon[8] on March 2, 2017.  (Tr. 580.)  Plaintiff

reported that she had constant and frequent pain in her neck, pain radiating

down into her right arm, right arm weakness and numbness, her pain was

worse with exercise, and she avoided work activities and exercise in the

previous month due to pain.  (*Id.*)  Plaintiff reported she had a cervical neck

fusion in May of 2016 and stated that "her symptoms stem from being an

ultrasound tech[nician] for over 25 years."  (*Id.*)  It was also noted that "the

surgery initially improved her symptoms to the point where she tried to work

again but now due to recurrence of pain she cannot work."  (*Id.*)  Plaintiff

reported having "pain in her neck (right side) with associated burning

numbness down right arm" and having tried "many modalities," including

"trigger point injections, fluoro[scopic] injections (which did help for 3-4

months), ice/heat, [and] topical medications."  (*Id.*)

A Review of Systems revealed Plaintiff had back pain, muscle aches,

---

[8] Dr. Cruz-Colon is Board Certified in Physical Medicine and Rehabilitation
and specializes in physical medicine and rehabilitation, interventional spine, and
sports medicine.

cramps, spasms, pain localized to one or more joints, and joint stiffness localized to one or more joints.  (Tr. 581.)  Dr. Cruz-Colon noted Plaintiff had tenderness on palpitation of the trapezius muscle (shoulder) and that her "paracervical muscles were tender on palpitation."  (Tr. 582.)  He also observed that Plaintiff's cervical spine did not show full range of motion; she had pain with both flexion and extension, but was more limited with extension; and "cervical spine pain was elicited by motion[,] worse with extension and turning head to the right."  (*Id.*)  Dr. Cruz-Colon performed a foraminal compression test, observing, in part, that the test caused "pain to radiate to the right arm with the head rotated to the right."  (*Id.*)  On neurological examination, he also noted Plaintiff had "decreased response to tactile stimulation" and "numbness down [the] right arm[,] mainly to level of [the] elbow," but the pain had recently been going into her hand and fingers. (*Id.*)  Dr. Cruz-Colon also noted Plaintiff had normal muscle bulk, muscle tone, and strength bilaterally.  (*Id.*)  Her gait, stance, and reflexes were also normal.  (Tr. 582-83.)  Dr. Cruz-Colon observed that Plaintiff's attention "demonstrated abnormalities."  (Tr. 583.)

Dr. Cruz-Colon reviewed Plaintiff's X-rays and MRI results of the cervical spine status post fusion and assessed Plaintiff with cervical disc degeneration and cervical neuritis.  (*Id.*)  Dr. Cruz-Colon's treatment plan included epidural steroid injections for Plaintiff's radiculopathy at C7-T1 and

increased Gabapentin dosage to 300 mg, three times per day.  (*Id.*)  He also discussed injection outcomes and surgical options with Plaintiff.  (*Id.*)

On March 9, 2017, Plaintiff returned to Dr. Cruz-Colon and received an interlaminar steroid injection at C7-T1.  (Tr. 584.)  At a follow-up appointment on March 27, 2017, Dr. Cruz-Colon noted: "Pain cannot be controlled in the neck or right arm [status post] C7-T1 ILESI [interlaminar epidural steroid injection] done 3/9/2017.  [P]atient reports some relief of upper back pain, however, no change in neck or right arm pain or numbness. She continues to take Gabapentin 300 [mg] [three times a day] with minimal relief and [to] do physician[-]directed at home stretching with minimal relief." (Tr. 586.)  Dr. Cruz-Colon's findings on examination and Review of Systems were unchanged.  (Tr. 587-88.)  His assessment again was cervical disc degeneration and cervical neuritis (radiculopathy of the cervical region).  (Tr. 588.)  Plaintiff's treatment plan included an epidural steroid injection at C7-T1 and referral to a neurosurgeon (Dr. Robertson).  (Tr. 589.)  Plaintiff was instructed to follow up after her visit with the spine neurosurgeon.  (*Id.*)

Plaintiff returned to Dr. Cruz-Colon on April 4, 2017 and received another epidural steroid injection at C7-T1.  (Tr. 590-91.)  On May 11, 2017, Plaintiff presented to Dr. Cruz-Colon for a follow-up visit, at which it was noted that her "[s]ymptoms [were] not controlled since last visit" and she reported 25 percent relief from the C7-T1 epidural injection.  (Tr. 592.)

Plaintiff stated that her pain returned when she started working again as an ultrasound technician and that the pain was on the right side of the neck, with numbness and burning down her right arm.  (*Id.*)  Plaintiff was not sleeping well and had to keep her right arm above her head for any relief. (*Id.*)  Her pain level was an 8 out of 10.  (*Id.*)  Upon examination Plaintiff appeared uncomfortable and physical findings were the same as previous visits.  (Tr. 594.)  Dr. Cruz-Colon's assessment included localized primary osteoarthritis of cervical vertebrae (spondylosis without myelopathy or radiculopathy, cervical region), cervical disc degeneration, and cervical neuritis (radiculopathy, cervical region).  (*Id.*)  Dr. Cruz-Colon administered a Ketorolac Tromethamine (Toradol) injection and his treatment plan included a trial of medial branch block ("MBB") injections at C2-C4.  (Tr. 595.)  Dr. Cruz-Colon discussed injection outcomes, surgical options, and radiofrequency ablation ("RFA"), and noted that Plaintiff "needs to see a surgeon."  (*Id.*)

On May 31, 2017, Dr. Cruz-Colon administered cervical MBB injections on the right at C2-C3, C3, and C4.  (Tr. 596-97.)  On July 6, 2017, Plaintiff presented to Dr. Cruz-Colon for cervical RFA treatment on the right at C2-C3, C3, and C4.  (Tr. 602-03.)  On July 20, 2017, Plaintiff presented for a follow-up visit with Dr. Cruz-Colon, at which it was noted that Plaintiff's symptoms were not controlled since the last visit.  (Tr. 604.)  Plaintiff

reported 50 percent relief with the MBB injections administered on May 31, 2017, and that the "[p]ain is controlled until she works" and "once she works she will get the neck pain radiating down her right arm with numbness and tingling." (*Id.*)  Plaintiff had no improvement after the right cervical RFA and continued to complain of right-sided cervical pain that radiated into her right shoulder.  (*Id.*)  Plaintiff again reported that "her pain increase[d] while at work as an ultrasound tech[nician]." (*Id.*)   Her pain level was a 6 out of 10.  (*Id.*)  Dr. Cruz-Colon noted the same physical, musculoskeletal, and neurologic findings as in previous visits, and noted that it was "still early for results from [the] RFA but long term, she will probably not be able to return to her job" and that she "should see Dr. Choksi [for] disability eval[uation]." (Tr. 606-07.)

Plaintiff presented for a follow-up appointment with Dr. Cruz-Colon on July 31, 2017, at which it was noted that Plaintiff's symptoms were not controlled since her last visit.  (Tr. 608.)  The treatment note indicates that Plaintiff complained of right-sided cervical pain that radiated into her right shoulder, she used heat and topical cream analgesics with minimal relief, and reported that her pain increased with activity.  (*Id.*)  Plaintiff used a neck brace with some relief.  (*Id.*)  Her pain level was an 8 out of 10.  (*Id.*)  Dr. Cruz-Colon again administered a Toradol injection and noted Plaintiff would "be off work for [the] next month . . . pending [her] disability eval[uation]."

(Tr. 610-11.)  Dr. Cruz-Colon noted: "We will proceed with [a] [three][-]level facet joint injection, we are treating mostly her neck pain, not her arm pain which is due to chronic radiculopathy."  (Tr. 611.)

Dr. Cruz-Colon continued to treat Plaintiff with various modalities, including right cervical facet joint injections on August 10, 2017, with 65 percent improvement; right cervical facet injections on November 10, 2017, with 70 percent improvement; right MBB injections at C2, C3, and C4 on August 23, 2018, with 70 percent improvement; and right cervical RFA on November 20, 2018, with zero percent improvement.[9]  (*See* Tr. 723.) Although Plaintiff reported some relief initially after these procedures, it was only temporary, as noted during the December 21, 2018 visit:

> Prior to injection, patient complained of a recurrence of right[-]sided cervical pain and muscle tightness in her right shoulder [status post] no known trauma since [O]ctober 2018.  She uses heat and topical cream prn currently since 08/2018 with minimal relief and she takes Gabapentin 300mg TID currently since 2017 with minimal relief.  She also currently takes Cyclobenzaprine 10mg TID with some relief [] since July 2018.  Pain increased with physical activity, especially upper body use.  History of

---

[9] Of note, on August 8, 2018, Plaintiff presented to Dr. Cruz-Colon for a follow-up visit, at which she reported, in part, recurrence of right-sided neck pain since April 2018, numbness and tingling to her right arm since April 2018, and stated that lifting and reaching overhead exacerbated her symptoms.  (Tr. 743.)  It was also noted that Plaintiff was taking Advil, using lidocaine patches, and doing physician-guided stretches at home with some relief.  (*Id.*)  Plaintiff also reported 65 percent improvement from cervical facet joint injections but rated her pain level as a 7 out of 10.  (*Id.*)  Dr. Cruz-Colon administered a Toradol injection and noted: "We discussed activity modification at home and work.  She is probably able to work to some degree but unable to do ultrasound work as the repetitive motion exacerbates her arm and neck pain."  (Tr. 746.)

cervical fusion in 2016. Patient does at home physician guided
stretches currently since October 2018. Patient had 70%
improvement [status post] right cervical MBB done on
08/23/2018.
. . .

Symptoms since last visit: As of 12/21/2018, patient states she
had 0% improvement [status post] RFA: Right Cervical done on
11/20/2018. Patient continues to complain of right[-]sided neck
pain that is increased with any activity involving her right arm.
She continues to use Gabapentin 300mg TID and
Cyclobenzaprine 10mg since March of 2018-current. She also
complains of muscle spasms and tightness un her right neck and
trapezius muscle. Patient has tried and failed multiple injections
with no relief. Her current pain level is an 8.

(Tr. 722.)

At the December 31, 2018 visit, Dr. Cruz-Colon also assessed cervical
spondylosis, drug-induced spasmodic torticollis (drug-induced subacute
dyskinesia), cervical neuritis (radiculopathy, cervical region), and muscle
spasm. (Tr. 725.) He also prescribed Botox injections, physical therapy, and
Cyclobenzaprine to treat Plaintiff's spasmodic torticollis. (*Id.*) Plaintiff was
instructed to follow-up within four weeks after the Botox injections. (*Id.*)
Dr. Cruz-Colon discussed injection outcomes, physical therapy, and activity
modifications at home with Plaintiff. (*Id.*) Dr. Cruz-Colon also tentatively
diagnosed Plaintiff with cervical post laminectomy syndrome due to
persistent pain and noted that they would "proceed with SCS [spinal cord
stimulation] trial given that she had surgery already and [is] currently
dealing with disabling pain." (*Id.*)

16

### 2.  Medical Source Statements from Dr. Cannon

On April 9, 2017, Dr. Cannon completed a Medical Source Statement of Ability to do Work-Related Activities (MSS).  (Tr. 619-20.)  He noted that he had treated Plaintiff twice and listed her diagnoses as cervical osteoarthritis, cervical radiculopathy, and cervical fusion.  (Tr. 619.)  He listed her symptoms as severe neck pain and right radiculopathy.  (*Id.*)  He opined that Plaintiff was limited in her work-related activities as follows: she can sit for 4 to 6 hours total, and stand/walk for 2 hours total, in an eight-hour workday; must periodically alternate between sitting and standing to relieve pain or discomfort every 30 minutes; can never carry 25 pounds or more, rarely carry 20 pounds or more, and can occasionally carry 10 pounds or less; can rarely use her upper extremities for pushing and/or pulling and can occasionally use her lower extremities for pushing and/or pulling.  (*Id.*)  He further opined that Plaintiff could rarely reach in all directions (including overhead) and she could frequently perform handling, fingering, and feeling.  (*Id.*)

Dr. Cannon also opined that Plaintiff would frequently experience "pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks." (Tr. 620.)  He also noted that she must avoid temperature extremes, vibration, and humidity/wetness, required unscheduled breaks every 30 to 60 minutes, and required walking breaks every hour.  (*Id.*)  He opined that Plaintiff would be

absent from work due to her impairments 4 days or more per month.  (*Id.*)  In describing responses to treatment "which may have implications for work activity," Dr. Cannon explained that Plaintiff would need to take pain medications, her neck is partially fused, and has severe neck pain radiating down her right arm.  (*Id.*)  He also described "the objective findings, clinical observations, and symptomology supporting [his] assessment" as: limited neck motion, difficulty concentrating, and right radicular pain.  (*Id.*)

Dr. Cannon also completed a Cervical Spine MSS on September 19, 2018.  (Tr. 717-21.)  Dr. Cannon noted he had four visits with Plaintiff in the previous year and a half and listed her diagnoses as cervical fusion at C5-C6 with continued neck pain and cervical radiculopathy.  (Tr. 717.)  He opined Plaintiff's prognosis was poor and that she had chronic pain/paresthesia which he described as "severe debilitating neck pain, with radiation to shoulder and down [the] [right] arm."  (*Id.*)  He identified the following signs, findings, and associated symptoms of Plaintiff's impairments: tenderness, crepitus, muscle spasm, muscle weakness, chronic fatigue, impaired sleep, reflex changes, atrophy, motor loss, dropping things, and reduced grip strength.  (*Id.*)  He noted Plaintiff had significant limitation of motion as follows: 10% extension, 20% flexion, 25% left and right rotation, and 20% left and right lateral bending.  (*Id.*)

He also stated that Plaintiff experienced severe headaches associated

with impairment of the cervical spine, and identified the following problems associated with these headaches: malaise, weight change, inability to concentrate, impaired sleep, exhaustion, mood changes, and mental confusion. (Tr. 718.) He noted Plaintiff experienced one headache a week, four times per month, which lasted for three hours and improved with lying down, taking medication, being in a quiet place/dark room, and using a hot pack. (*Id.*) He opined Plaintiff's impairments were expected to last at least twelve months and that Plaintiff was not a malingerer. (*Id.*) He also opined emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations, including depression and anxiety. (Tr. 719.) He stated that "from an ortho[pedic] standpoint[,] these are [illegible] due to her neck." (*Id.*) He noted that Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation. (*Id.*) He further opined that Plaintiff would constantly experience pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks and that Plaintiff was incapable of even "low stress" jobs because her pain is overwhelming. (*Id.*)

Dr. Cannon further opined that Plaintiff can only walk one to two city blocks without rest or severe pain; sit for 45 minutes before needing to get up; stand for 45 minutes before needing to sit down, walk around, *etc.*; and sit

and stand/walk for about 4 hours in an eight-hour workday as she "would have to alternate and may need to periodic[ally] lie down." (Tr. 719-20.) Plaintiff would also have to walk around every 60 minutes for five to ten minutes as tolerated and would need a job that permits shifting positions at will from sitting, standing, or walking. (Tr. 720.) Plaintiff would also need to take unscheduled breaks at least once per hour for 10-15 minutes during an eight-hour workday, and, on such breaks, Plaintiff would have to lie down or "rest [her] head on a high back chair." (*Id.*) Plaintiff could never lift ten pounds or more and rarely less than ten pounds; rarely look down, look up, or hold her head in static position; and could rarely or occasionally turn head right or left. (*Id.*) She could never climb ladders or stairs, rarely stoop (bend), crouch or squat, and could occasionally twist. (Tr. 721.)

Plaintiff also had significant limitations with reaching, handling, or fingering due to pain in her right arm and, in an eight-hour workday, she could only grasp, turn, or twist object with her hands bilaterally up to 10% of the time, use her fingers for fine manipulation, bilaterally, 15% of the time, could never reach with the right arm, and could reach 10% of the time with her left arm, but with no overhead reaching. (*Id.*) Plaintiff's impairments were likely to produce "good days" and "bad days" and, as a result of her impairments or treatment, Plaintiff would be absent from work more than four days per month. (*Id.*) Dr. Cannon also noted that Plaintiff's "neck and

arm pain [was] constant" and "if she did activities she would be in pain and [would] have difficulty focusing and performing work." (*Id.*)

### D.   The ALJ's Findings

At the first step of the five-step sequential evaluation process,[10] the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of January 1, 2017. (Tr. 33.)  Although Plaintiff's earnings showed she was working during 2017, the ALJ found that "these appear[ed] to be unsuccessful work attempts." (*Id.*)  The ALJ noted that "generally, work that the claimant is forced to stop or to reduce below the substantial gainful activity level because of an impairment will be considered to be an unsuccessful work attempt" and "earnings from an unsuccessful work attempt will not show an ability to perform substantial gainful activity." (*Id.*)  Nevertheless, the ALJ found that "[a]lthough the work activity did not constitute disqualifying substantial gainful activity, it suggests that the claimant's alleged pain was not as disabling as presented and that her daily activities have been greater than reported." (*Id.*)  The ALJ also found that "this activity is inconsistent with the allegations of total disability" and "the fact that the claimant's impairments did not prevent the

---

[10] The Commissioner employs a five-step process in determining disability. *See* 20 C.F.R. § 404.1520(a)(4).

claimant from working at that time strongly suggests that it would not currently prevent work." (*Id.*)

At step two, the ALJ found Plaintiff had the following severe impairments: degenerative disc disease of the cervical spine and carpal tunnel syndrome ("CTS"). (*Id.*) The ALJ also found Plaintiff had non-severe impairments, including left-knee disorder, side effects of medication, obesity, and mental health issues, but determined that "there is no evidence of aggressive medical treatment or hospitalization for these impairments or that [they] cause more than a minimal effect on the claimant's" RFC. (*Id.*) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (Tr. 39.)

Before proceeding to step four, the ALJ found that Plaintiff had the RFC to perform a reduced range of light work[11] with the following limitations:

> [The claimant can] frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but no ladders, ropes or scaffolds; frequently handle and reach in all directions with the right dominant hand, and frequently reach overhead bilaterally. Avoid: constant vibration, work at heights, work with dangerous

---

[11] By definition, light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; it requires a good deal of walking, standing, or sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. § 404.1567(b); SSR 83-10.

> machinery, and constant temperatures over 90 [degrees]
> [Fahrenheit] and under 40 [degrees] [Fahrenheit].  Work tasks
> can include frequent interaction with the general public.

(*Id.*)  In determining Plaintiff's RFC, the ALJ stated that she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 [C.F.R.] [§] 404.1529 and SSR 16-3p," as well as the opinion evidence in accordance with 20 C.F.R. § 404.1527. (*Id.*)

> The ALJ then discussed Plaintiff's subjective complaints as follows:

> The claimant, who is now forty-eight[12] years old, alleges
> disability due to limitations imposed by degenerative disc disease
> of the cervical spine and carpal tunnel syndrome [].  The claimant
> testified her pain makes it difficult to perform even ordinary
> activities.  Despite [a] previous cervical fusion, the claimant
> stated that she has pain in her back which radiates down her
> arm [].  The claimant testified her pain interferes with
> concentration.  The claimant affirmed she uses a neck brace,
> which helps.  She affirmed it is difficult to pick up objects off the
> floor or to squat.  Due to shoulder pain, the claimant also testified
> it is difficult to lift objects heavier than a gallon of milk.  The
> claimant indicated she is unable to stand and walk for prolonged
> periods.
> . . .

(Tr. 40.)

---

[12] Plaintiff was actually fifty-eight years old on the date of the ALJ's decision. (*See* Doc. 25 at 2-3 (citing Tr. 217).)  The ALJ also confirmed Plaintiff's date of birth at the hearing.  (*See* Tr. 57 (confirming Plaintiff was born in 1960).)  It is unclear whether this was a scrivener's error or a more substantial error that affected the ALJ's ultimate findings, and in particular her finding that "Grid Rule 201.06" did not apply.  (Tr. 43.)

The ALJ then summarized the medical evidence prior to the amended alleged onset date as follows:

> The medical records prior to the amended alleged onset date were significant[,] showing the claimant received treatment for symptoms of cervical pain.  The claimant was treated by primary care provider Michael R. Gray, M.D. . . . .  The claimant also received ablation treatment from the Center for Pain Management in 2014 [].  The claimant further received treatment from the following facilities prior to the relevant period[:] Rincon Pain Management for trigger point injections to the cervical region, Porter Regional Hospital for lab and diagnostic workup, Core Institute Spine Center for cervicalgia, and Lakeshore Bone and Joint Institute for cervical pain [].

(Tr. 40.)  The ALJ then discussed the treatment records from Dr. Cannon as follows:

> [T]he claimant received treatment from Ocala Orthopaedic Group and on the January 30, 2017 examination, it was noted the claimant tried to avoid pain medication for concerns of dependency.  The claimant reported she enjoys playing guitar.  O.F. Cannon, Jr., M.D., noted the claimant was in obvious severe pain but in no acute distress.  The neurovascular examination [revealed] a radicular component down the right arm with paracervical pain.  Dr. Cannon administered injections for these areas and recommended a no work status as she was in no condition to travel or return to work as an ultrasound technician due to neck fusion and ongoing cervicalgia.  The claimant was also prescribed pain medication. The April 6, 2017 study noted decreased cervical mobility with marked spasm but range of motion in shoulders [was] good.  Dr. Cannon again opined the claimant cannot work and it will be difficult for her to concentrate.  On May 25, 2017, the claimant still had radicular pain but affirmed she had relief from the trigger point injections [].  On April 9, 2017, Dr. Cannon opined the claimant can stand and walk for up to two hours, sit for four to six hours, and lift ten pounds at most on an occasional basis.  Dr. Can[n]on further opined the claimant could only reach on a rare basis and would

24

require unscheduled breaks and be absent for more than four
days a month [].

On September 19, 2018, Dr. Cannon submitted a medical source
statement affirming the diagnoses is [sic] cervical fusion with
continued neck pain and cervical radiculopathy.  Dr. Cannon also
affirmed the claimant had a reduced cervical range of motion and
her depression and anxiety stem from her neck problems.  Dr.
Cannon [sic] symptoms will constantly interfere with
concentration and attention due to pain, [and] the claimant is
incapable of even low stress work.  Dr. Cannon opined the
claimant can sit, stand and walk for about four hours and lift
only less than ten pounds with several limits with postural
activities.  There were also opined limits with use of the right
arm, including no overhead reaching [].

(Tr. 40-41.)

The ALJ also summarized the treatment records from Dr. Cruz-Colon,

as follows:

The claimant was treated by Eduardo J. Cruz-Colon, M.D., of the
Ocala Family Medical Center, including [sic] corticosteroid
injections to the cervical joint and neuroablation [].  On the initial
examination from March 2, 2017, it was noted there was
tenderness in the shoulders.  Dr. Cruz further observed the
cervical spine was tender with a decreased and painful range of
motion with radiating pain down the right arm.  However, Dr.
Cruz also observed a [sic] normal muscle strength throughout
and unremarkable gait.  Dr. Cruz diagnosed the claimant with
cervical disc degeneration and cervical neuritis [].  The May 11,
2017 examination yielded the same findings and on May 31,
2017, Dr. Cruz informed the claimant can return to work on June
3, 2017 [].  Dr. Cruz affirmed in a June 9, 2017 letter, the
claimant can return to work on June 11, 2017 without
restrictions [].

Throughout examinations, Dr. Cruz repeatedly observed the
claimant appeared uncomfortable with a cervical spine that
exhibited a decreased and painful range of motion, and pain

25

radiated to the right arm but not the left side.  It was also
reportedly observed there was tenderness in the shoulders.
Neurologically, it was repeatedly noted there was decreased
sensation and numbness in right arm.  However, Dr. Cruz
continually observed there was normal muscle bulk, tone and
strength, and gait and stance was [sic] also normal [].

A statement was received on August 29, 2017 from an "Inez" who
worked for Dr. Cruz stating the medication and ablation was not
providing significant relief, even with taking the claimant out of
work for a month [].  However, a subsequent record submitted on
September 20, 2017, from the office manager, Jeremy Gonzalez,
affirmed they could not verify the information [].  On August 8,
2018, the claimant reported some relief with home[] physician[-
]guided stretches and 65% improvement with cervical facet
steroid injections [].  On February 14, 2019, Dr. Cruz
administered [B]otox injections [].

(Tr. 41.)

The ALJ also summarized the evaluation by "independent medical

examiner Samer R. Choksi, M.D.," who examined Plaintiff on August 10,

2017, as follows:

On August 10, 2017, [Dr. Choksi] evaluated the claimant and
observed few findings.  The claimant reported she is currently
independent without restrictions with bathing, showering,
dressing, grooming, housekeeping, laundering, shopping,
toileting, and transferring.  Dr. Choksi observed the neck
exhibited a decreased range of motion and tenderness.  However,
there was no evidence of swelling, deformity or atrophy.
Furthermore, the thoracic and lumbar spine examination[s] were
normal [].

Dr. Choksi also observed the right wrist demonstrated
tenderness with a decreased range of motion and the right hand
was also tender.  However, no evidence of atrophy or decreased
sensation was present and motor strength was 5/5.  Dr. Choksi
also observed fine manipulation of the right hand was normal.

26

The remainder of the upper extremities was normal, including the shoulders.  The lower extremities were also normal and a full 5/5 motor strength was observed throughout.  Dr. Choksi also observed a normal gait and the claimant was able to walk over rough/uneven surfaces, was able to squat and rise, and she had normal heel and toe ambulation and tandem walk [].  Dr. Choksi diagnosed the claimant with carpal tunnel syndrome (CTS) in the right upper limb and cervicalgia.  Dr. Choksi opined the claimant is capable of the reported activities indecently [sic] and she can manage her personal finances [].

(Tr. 41-42.)  The ALJ also noted that "[n]eurologist William Gaya, M.D., ordered on January 30, 2018, a brace splint to address CTS" and "also listed pain in [the] right arm, cervicalgia[,] and CTS were active medical problems."  (Tr. 42.)

The ALJ found that Plaintiff's "alleged physical impairments, treatment records, and findings on physical examination, are consistent with the above [RFC] assessment."  (Tr. 42.)  The ALJ explained that she considered Plaintiff's allegations and testimony, concluding that Plaintiff's "impairments affected her level of functioning," but found that "the evidence of record during the relevant period at issue does not support the degree of limitation alleged."  (*Id.*)  According to the ALJ, Plaintiff's overall allegations of disabling symptoms are inconsistent with the medical records.  (*Id.*)  The ALJ further explained:

> Throughout examinations, Dr. Cruz repeatedly observed the cervical spine exhibited a decreased and painful range of motion, and pain radiated to the right arm but not to the left side.  It was also repeatedly observed there was tenderness in the shoulders.

> Neurologically, it was repeatedly noted there was decreased
> sensation and numbness in the right arm.  However, Dr. Cruz
> continually observed there was normal muscle bulk, tone and
> strength, and gait and stance was [sic] also normal [].
> Independent medical examiner Dr. Choksi observed few findings.
> . . .

(*Id.*)  The ALJ pointed to Dr. Choksi's findings, including a lack of evidence of

swelling, or atrophy, normal motor strength, etc., and found that "[t]hese

factors demonstrate inconsistencies between symptom presentation and the

objective examinations, including the study from an independent medical

examiner."  (*Id.*)

The ALJ also found there were "several documented records of good

activities of daily living which are inconsistent with entirely disabling

symptoms" and that while Plaintiff testified she had "radiating nerve pain in

her arms, there are several forms with lengthy handwritten notes and

responses."  (Tr. 43.)  The ALJ also noted that despite Plaintiff's CTS, she

"enjoys playing guitar."  (*Id.*)  The ALJ reasoned that based on these factors,

and reportedly independent activities of daily living, "[c]oupled with the

medical examinations, these activities also underscore the position that the

claimant is not disabled."  (*Id.*)  The ALJ then noted that she considered

Plaintiff's representative's brief but did "not find that Medication-Vocational

[sic] Grid Rule 201.06 applies or that residual functional capacity is

sedentary or less."  (*Id.*)  Thus, the ALJ determined that while Plaintiff's

medically determinable impairments could reasonably be expected to cause the alleged symptoms, her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.*)

In evaluating the opinion evidence of record, the ALJ accorded great weight to the opinion of the State agency consultant, Cristina Rodriguez, M.D., "who opined the claimant can perform at the light exertional level." (*Id.*) The ALJ found the State agency consultant's opinions were supported by "treating physician Dr. Cruz's records" and that "[t]hroughout examinations, Dr. Cruz repeatedly observed the cervical spine exhibited a decreased range and painful range of motion, and pain radiated to the right arm but not to the left side" and "repeatedly observed there was tenderness in the shoulders." (*Id.*) However, according to the ALJ, "Dr. Cruz continually observed there was normal muscle bulk, tone and strength." (*Id.*) The ALJ also pointed to Dr. Choksi's findings that Plaintiff's neck had a decreased range of motion and tenderness, but there was no swelling or atrophy, and that while her right hand was tender, the remainder of the extremities appeared normal and full motor strength was observed throughout. (*Id.*) Thus, the ALJ found that "[a]lthough records received at the hearing level show greater limitations are appropriate, Dr. Rodriguez's opinions are overall consistent with the medical records." (*Id.*)

The ALJ then accorded little weight to Dr. Cannon, explaining:

Dr. Cannon observed radicular component down the right arm with paracervical pain and decreased cervical mobility with a spasm.  However, there are no records Dr. Cannon tested motor strength, or range of motion in the entire body, or a thorough examination of the musculoskeletal and neurological systems. There are no records that the claimant's concentration and attention were studied either.  Further, Dr. Cannon noted the claimant's shoulders had a good range of motion and on May 25, 2017, the claimant affirmed she had relief from the trigger point injection.  These opinions were without full support or clear explanation and appear conclusory.  Additionally, the opinion of a no work status cannot be accepted because a statement by a medical source that the claimant is "disabled" or "unable to work" is not an opinion as to the nature and severity of the claimant's impairment, and therefore, an issue reserved for the commissioner [].  Little weight given is appropriate.

(Tr. 44.)

The ALJ also assigned little weight to the opinions of Dr. Cannon in his April 9, 2017 and September 19, 2018 MSS "for the same reasons above." (*Id.*)  The ALJ found that "the less than sedentary restrictions are not supported by the respective examinations and again, the opinions appear conclusory at best."  (*Id.*)  The ALJ explained "there is no documented study demonstrating Dr. Cannon examined the claimant's systems, including mental health" and "the opinions are inconsistent with Dr. Cruz's examinations, which repeatedly noted there was normal muscle bulk, tone, strength, gait and stance []."  (*Id.*)  The ALJ also found that Dr. Cannon's "opinions are also inconsistent with independent medical examiner Dr.

Choksi who observed tenderness and a reduced range of motion in the neck
and right wrist" but "the remainder of the examination was normal, including
no evidence of atrophy and muscle strength as 5/5 throughout the entire
body." (*Id.*)

The ALJ then also gave limited weight to Dr. Cruz's opinions as
follows:

> On May 31, 2017, Dr. Cruz informed claimant can return to work
> on June 3, 2017 []. Dr. Cruz affirmed in a June 9, 2017, [sic] the
> claimant can return to work on June 11, 2017 without
> restrictions []. These opinions were made for the purposes of
> healing and not as permanent work restrictions. Therefore, the
> undersigned accords limited weight to Dr. Cruz's opinions.

(*Id.*)

The ALJ accorded great weight to the opinion of Dr. Choksi "because it
was consistent with the observations made during and resulting from the
respective study" including, *inter alia*, decreased range of motion in the neck,
but no evidence of swelling or atrophy, normal thoracic and lumbar spine
examination, right wrist and hand tenderness with decreased range of
motion, but normal fine manipulation of the right hand, otherwise normal
extremities, full 5/5 motor strength, normal gait, and normal "psychiatric
inspection." (*Id.*) The ALJ also stated that she considered the January 27,
2019 letter from Plaintiff's boyfriend but accorded it little weight. (Tr. 45.)

In light of the foregoing, the ALJ concluded that Plaintiff retained the ability to perform work activities consistent with the RFC.   (*Id.*)

At step four, the ALJ determined that Plaintiff was capable of performing past relevant work as an ultrasound technologist, as actually and generally performed, as this work did "not require the performance of activities precluded by" her RFC.[13]  (Tr. 45.)  Thus, the ALJ concluded that Plaintiff was not disabled from January 1, 2017 through April 29, 2019.  (Tr. 45-46.)

### III.   Analysis

The Court agrees with Plaintiff that the ALJ's reasons for discounting the opinions of Dr. Cannon are not supported by substantial evidence. Plaintiff argues that although the ALJ found that she has the RFC to perform less than a full range of light work with limitations, the ALJ's RFC determination "is unsupported by substantial evidence because" the ALJ "failed to properly weigh the opinion of treating physician Dr. Cannon, who opined limitations that would be disabling."  (Doc. 25 at 13.)  Plaintiff contends that "the ALJ fail[ed] to consider the entirety of Dr. Cannon's examination history and instead focuse[d] on examination findings that

---

[13] The ALJ noted that the vocational expert ("VE") testified that Plaintiff's past work as an ultrasound technologist was "characterized as skilled work, with an SVP [specific vocational profile] of 7, requiring light level of exertion but performed at a medium level."  (Tr. 45.)

support her conclusion." (*Id.* at 16.)  Plaintiff also argues, *inter alia*, that the evidence of record is supportive of and consistent with Dr. Cannon's opinions, including the treatment records from Dr. Cruz-Colon, and that the ALJ failed to adequately explain her decision to accord great weight to the vague opinions of Dr. Choksi, a one-time examiner, while according little weight to Dr. Cannon, a treating source.  (*Id.* at 17-18.)

Defendant counters that "[t]he ALJ properly explained that she granted little weight to these opinions because they were inconsistent with Plaintiff's relatively mild treatment records including Dr. Cannon's own examinations, Dr. Cannon did not provide support for his opinions, and Dr. Cannon's opinions were inconsistent with Dr. Choksi's consultative examination and opinion" and that, in doing so, the ALJ "provided good reasons for assigning Dr. Cannon's opinions little weight."  (Doc. 26 at 7.) Although Defendant counters that the ALJ properly weighed the opinion of Dr. Cannon, these arguments are unavailing.  The undersigned agrees with Plaintiff that the ALJ's assessment of Dr. Cannon's opinions and treatment records is unsupported by substantial evidence.

As noted above, an ALJ must "consider all medical opinions in a claimant's case record, together with other relevant evidence." *McClurkin v. Soc. Sec. Admin.*, 625 F. App'x 960, 962 (11th Cir. 2015) (citing 20 C.F.R. § 404.1527(b)).  "Medical opinions are statements from physicians and

psychologists or other medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178-79 (11th Cir. 2011) (internal citations omitted).  An ALJ must also specifically state the weight accorded to different medical opinions, and the reasons for doing so.  *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).  The ALJ must give a treating physician considerable weight, unless there is good cause to do otherwise.  *Lewis*, 125 F.3d at 1440.  Moreover, an "ALJ's rejection of a treating physician's opinion must be supported by clearly articulated reasons."  *Bradley-Bell v. Berryhill*, No. 8:18-cv-863-T-AAS, 2019 WL 2480064, at *3 (M.D. Fla. June 13, 2019) (citing *Phillips*, 357 F.3d at 1240-41).  "Without clearly articulating [her] reason for rejecting a treating physician's opinion, the reviewing court cannot determine if the ALJ's decision is rational or supported by substantial evidence."  *Id.* (citing *Winschel*, 631 F.3d at 1179).  "Therefore, when the ALJ fails to 'state with at least some measure of clarity the grounds for [her] decision,' [the reviewing court] will decline to affirm 'simply because some rationale might have supported the ALJ's conclusion.'"  *Id.*  (quoting *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984)).

As an initial matter, the ALJ's evaluation of the opinion evidence is difficult to follow.[14]  For example, after listing objective findings observed by Dr. Cannon, including "radicular component down [Plaintiff's] right arm with paracervical pain and decreased cervical mobility with a spasm," the ALJ stated that "[t]hese opinions were without full support or clear explanation and appear conclusory."  (Tr. 44.)  The ALJ then accorded little weight to Dr. Cannon's opinion of "no work status" as it was an issue reserved for the Commissioner.  (*Id.*)  The ALJ then stated: "[l]ikewise, the undersigned accord[s] little weight to Dr. Cannon's April 9, 2017 and September 19, 2018 medical source statement[s] for the same reasons above."  (*Id.*)  The ALJ further reasoned that Dr. Cannon's "less than sedentary restrictions are not supported by the respective examinations and again, the opinions appear conclusory at best."  (*Id.*)  The ALJ then stated that there "is no documented study demonstrating Dr. Cannon examined the claimant's systems, including mental health" and the opinions "are inconsistent with Dr. Cruz's examinations, which repeatedly noted there was normal muscle bulk, tone, strength, gait[,] and stance."  (*Id.*)  She also found that Dr. Cannon's opinions were inconsistent with Dr. Choksi's opinions, "who observed tenderness and a

---

[14] There appears to be a logical disconnect between the ALJ's assessment of the objective medical evidence, evaluation of the opinion evidence, her RFC determination, and her ultimate finding that Plaintiff could return to work as an ultrasound technician.

reduced range of motion in the neck and right wrist" but the remainder of his examination was "normal." (*Id.*)  However, the ALJ's discussion and evaluation of the treatment records and opinions of Dr. Cannon lack clarity and frustrate judicial review.

Also, in rejecting the opinions of Dr. Cannon, the ALJ relied on Dr. Cruz-Colon's normal examination findings, such as normal gait, stance, muscle bulk, and extremity strength, but the ALJ essentially ignores Dr. Cruz-Colon's consistent positive examination findings, including foraminal compression tests of the cervical spine with the head rotated right resulting in pain radiating to the right arm, decreased response to tactile stimulation and numbness down the right arm, tenderness in the paracervical muscles, pain elicited with cervical motion, and reduced range of motion in the cervical spine. (*See, e.g.*, Tr. 582, 594, 606, 609-10, 724, 731, 745, 751.)  The ALJ also fails to address or acknowledge the relevant medical evidence and records of concurrent treatment by Dr. Cruz-Colon, which provide support for Plaintiff's complaints and symptoms, as well as Dr. Cannon's opinions.  Contrary to the ALJ's conclusory determination that Dr. Cannon's opinions were "inconsistent with" Dr. Cruz-Colon's examinations, Dr. Cannon's opinions and treatment records appear to be consistent with and supported by Dr. Cruz-Colon's opinions and findings.  (*Compare* Tr. 564 (Dr. Cannon's January 30, 2017 opinion that Plaintiff "will not be able to return to working as an

ultrasound technician due to the neck fusion and ongoing cervicalgia") *with* Tr. 746 (Dr. Cruz-Colon's August 8, 2018 opinion that Plaintiff "is probably able to work to some degree," but she is "unable to do ultrasound work as the repetitive motion exacerbates her arm and neck pain")[15].)

Additionally, contrary to Defendant's arguments, the evidence does not show "mild treatment records," and the examination findings were not as unremarkable as the ALJ seems to suggest.[16]  Plaintiff's treatment included

---

[15] The ALJ failed to specifically discuss this opinion by Dr. Cruz-Colon. Moreover, conspicuously absent from the ALJ's decision is any meaningful discussion of the longitudinal evidence indicating that Plaintiff's cervical pain and radiculopathy were attributed to or exacerbated by her work as an ultrasound technician.  (*See, e.g.*, Tr. 662 (noting, on March 1, 2013, "patient states her pain and discomfort began back 5 years ago doing ultrasound scanning, states from repetitive motion"); Tr. 535 (noting, on October 18, 2016, that Plaintiff "tried to do ultrasounds again and she began having new radicular pain in a new distribution with pain in the right shoulder to about the elbow now" and that "she was doing well after surgery until she started working as a[n] [ultrasound technician] again"); Tr. 586 ("[Patient] states that her symptoms stem from being and ultrasound tech[nician] for over 25 years.  The surgery initially improved her symptoms to the point where she tried to work again but now due to recurrence of pain she cannot work."); Tr. 592 ("Patient states she got 25% relief from her [C]7-[T]1 [injection] on 04/04/17.  Pain returned when she started back working as an ultrasound tech. Pain in neck on the right with numbness and burning down the right arm."); Tr. 604 ("As of 6/21/17, patient stated she got 50% relief from her [MBB] [and] [RFA] trial [at] [C2-C4] on 5/31/17.  Pain is controlled until she works.  Once she works[,] she will get the neck pain radiating down the right arm with numbness and tingling.").)

[16] Plaintiff's moderate to severe pain was also well-documented and confirmed by the physical examinations in the record.  (*See* Tr. 580, 592, 604, 608, 722, 743-44, 749.)  Furthermore, the abnormal MRIs, while performed before the amended alleged onset date, were consistent with the examination findings and Plaintiff's reported symptoms.  (*See* Tr. 456, 546, 561-64, 722-25.)  Those results, along with the physical examination findings and Plaintiff's course of treatment, supported Plaintiff's complaints of disabling symptoms.

ACDF surgery, medications, physical therapy, trigger point injections, multiple epidural steroid injections, RFA treatment, and Botox injections, which only appeared to provide limited temporary relief.  (*See* Tr. 491, 495, 535, 536; *see also* Tr. 586 (stating "pain cannot be controlled in neck"); Tr. 592 (stating "symptoms not controlled"); Tr. 604 (stating "symptoms not controlled since last visit"); Tr. 722 ("Patient has tried and failed multiple injections with no relief.").)  As recently as December 21, 2018, Dr. Cruz-Colon noted that Plaintiff had tried and failed multiple injections with no relief and had developed "drug-induced spasmodic torticollis," requiring treatment with Botox injections and physical therapy.  (Tr. 722-25.)  Dr. Cruz-Colon also appeared to diagnose Plaintiff with cervical post laminectomy syndrome due to "persistent pain" and indicated that Plaintiff would proceed with SCS (spinal cord stimulation) "given that she had surgery already and [is] currently dealing with disabling pain."  (Tr. 725.)

Although "[a]n ALJ is not required to refer to every piece of evidence in [her] decision," an "ALJ may not engage in picking and choosing evidence to justify the denial of a claim."  *Bradley-Bell*, 2019 WL 2480064, at *4 (citing *Marbury v. Sullivan*, 957 F.2d 837, 839-41 (11th Cir. 1992); *Boughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985)).  An ALJ is "free to reject the opinion of any physician when the evidence supports a contrary conclusion."  *Huntley v. Comm'r of Soc. Sec. Admin.*, 683 F. App'x 830, 832 (11th Cir. 2017)

(citing *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985)).  However, an "ALJ may not ignore relevant evidence, particularly when it supports the plaintiff's position." *Bradley-Bell*, 2019 WL 2480064, at *4 (citing *Meek v. Astrue*, No. 3:08-cv-317-J-HTS, 2008 WL 4328227, at *1 (M.D. Fla. Sept. 17, 2008)).  Here, the ALJ erred by failing to evaluate and properly consider "crucial portions of medical evidence and not providing good cause for doing so." *Bradley-Bell*, 2019 WL 2480064, at *4.  These errors render the Court unable to determine "whether the ALJ's decision is supported by substantial evidence" and requires remand.  (*Id.*)

Furthermore, to the extent the ALJ relied on the opinions of Dr. Choksi[17] (a one-time examiner) and Dr. Rodriguez[18] (a State agency non-examining consultant) in discounting the opinions of Dr. Cannon and Dr. Cruz-Colon, neither Dr. Choksi nor Dr. Rodriguez had an opportunity to review the more recent treatment records showing that Plaintiff's condition appeared to deteriorate and that her symptoms could not be controlled with current treatment, including medication, epidural steroid injections, and RFA.  (*See, e.g.*, Tr. 722-25.)  As such, the Court can only speculate whether Dr. Rodriguez or Dr. Choksi would have reached the same conclusions if they

---

[17] Dr. Choksi's September 19, 2017 report was based on his examination of Plaintiff on August 10, 2017.  (Tr. 613-18.)

[18] Dr. Rodriguez rendered her opinion on October 26, 2017.  (Tr. 158.)

had been presented with the complete record.  Considering this uncertainty and the lack of substantial evidence to support the ALJ's reasons for discounting Dr. Cannon's opinions, the Court concludes that under the circumstances, the case should be remanded for reconsideration of the opinion evidence of record.

Based on the foregoing, the ALJ's reasons for rejecting the opinion of Dr. Cannon were vague and unsupported by substantial evidence.  Therefore, the undersigned finds that this matter is due to be remanded with instruction for the ALJ to expressly address Dr. Cannon's opinion regarding Plaintiff's limitations, in light of the record as a whole, including the opinion evidence of Dr. Cruz-Colon.  In light of this conclusion, the Court need not address Plaintiff's remaining arguments.  *See Jackson v. Bowen*, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (per curiam); *Freese v. Astrue*, 2008 WL 1777722, at *3 (M.D. Fla. Apr. 18, 2008).

Accordingly, it is **ORDERED**:

1.    The Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this Order, pursuant to sentence four of 42 U.S.C. § 405(g) with instructions to the ALJ to conduct the five-step sequential evaluation process in light of all the evidence, including the opinion evidence from treating, examining, and non-examining sources,

conduct any further proceedings deemed appropriate, and to develop a complete record.

2.     The Clerk of Court is directed to enter judgment accordingly, terminate any pending motions, and close the file.

3.     In the event that benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in *In re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) & 1383(d)(2)*, Case No.: 6:12-mc-124-Orl-22 (M.D. Fla. Nov. 13, 2012). This Order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

**DONE AND ORDERED** at Jacksonville, Florida, on October 18, 2021.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record